# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAY DRAOUA,<br>　　　　*Plaintiff*,<br><br>　　　v.<br><br>HARTFORD  HEALTHCARE  MEDICAL  GROUP,<br>INC.,<br>　　　　*Defendant*. | No. 3:21cv946(MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Jay Draoua brings this action against his former employer, Hartford Healthcare Medical Group, Inc. ("Hartford Healthcare"), alleging it discriminated against him based on his national origin (Algerian) and religion (Muslim) and retaliated against him when he complained, in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.* Hartford Healthcare moves for summary judgment on all claims.  ECF No. 63. For the reasons that follow, the motion is GRANTED.

## I.　　Factual Background

The facts set forth below are taken from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise stated.

Draoua is a psychiatrist.  ECF No. 66-3 at 12.  He is from Algeria and is Muslim.  *Id.* at 9-10.  In November 2016, Dr. Newfield, Chair of the Department of Psychiatry at St. Vincent's Medical Center, interviewed and hired Draoua as a per diem psychiatrist.  ECF No. 66-2 ¶ 1.  As a per diem psychiatrist, Draoua reported to Dr. Newfield.  *Id.* ¶ 2.

In July 2017, Newfield offered Draoua employment as (1) a full-time psychiatrist and (2) the Director of Training and Education of Department of Psychiatry at the Westport Behavorial

Health Services campus of St. Vincent's Medical Center.  *Id.* ¶ 3.  The anticipated workload between the two roles was 40 hours per week for the clinical position and 20 hours per week for the Director of Training and Education of Department of Psychiatry role.  *Id.*  Draoua accepted both positions and signed an Employment Agreement effective July 1, 2017.  *Id.* ¶ 4.  The Employment Agreement required Draoua to "work with and relate to other physicians, members of other healthcare disciplines, employer management and employees, patients, visitors, family members and the community in general in a cooperative, non-disruptive and professional manner."  *Id.* ¶ 5.  The agreement also required Draoua to maintain a full-time schedule, which included Monday through Friday.  *Id.* ¶ 6.  Either party could terminate the agreement without cause with "30 days prior written notice to the other party."  *Id.* ¶ 7.  Draoua reported to Dr. Lieberman, who was the Medical Director.  *Id.* ¶ 11.  Lieberman, in turn, reported to Newfield.  *Id.*

**Westport Facility**

The Westport campus where Draoua worked is an inpatient psychiatric facility. *Id.* ¶ 12. Access is highly restricted.  *Id.* ¶ 14.  Hartford Healthcare requires that employees wear a badge that identifies their name and title and displays their photograph.  *Id.* ¶ 15.  Employees utilize the Hartford Healthcare security badge to enter the facility and various areas inside.  *Id.* ¶ 13. Draoua was issued such a security badge – it displayed his name, photograph, employer, and field of specialty.  ECF No. 66-2 ¶ 16; ECF No. 66-6 at 49; ECF No. 63-2 at 67 (photo of his badge).

**Clerkship Director Position**

In December 2017, Newfield offered Draoua an additional role of Clerkship Director. ECF No. 66-2 ¶ 8.  Draoua accepted the role and received a salary increase.  *Id.*  In this role, he

reported to the Dean of Education of the Quinnipiac Medical School.  *Id.* ¶ 9; ECF No. 66-6 at

13.  Although Draoua was paid for the new position, he did not receive a new contract from

Hartford Healthcare, which he believes he should have.  ECF No. 66-3 at 60.  Draoua testified

that when he inquired about a new contract, Newfield told him that "you are paid enough.  You

are getting the money.  As if I [Draoua] was not deserving the money I was making."  *Id.* at 62.

According to Draoua, Newfield would refer to how much money Draoua made and "[s]ometimes

he [would] look at me and say[] how does it feel to be paid more than your chairman?"  *Id.*

Newfield also made comments to Draoua to the effect of "do you think in Algeria people are

making that kind of money jokingly, half jokingly."  *Id.* at 63, 66 (testifying that he didn't recall

whether Newfield specifically "spoke about Algeria" but that he referred to "where you come

from").

**Weekly Meetings with Newfield**

Beginning in January 2018, Newfield instituted weekly meetings with Draoua.  ECF No.

66-2 ¶ 27.  Newfield testified the meetings were to discuss education and to provide Draoua with

coaching. ECF No. 66-9 at 46, 70.  According to Draoua, when Newfield

> started to have a weekly meeting with me, he said we need to talk about education
> and all of that. And I was very pleased that he's showing some interest in
> education.  Immediately it was very clear that the meetings were more a time for
> him to voice – I never felt this – I never left this meeting feeling good.
> Undermining me, bringing things, very fuzzy things, I heard a lot of statements
> with 'I heard.' I heard you had this problem with one staff, female.  I don't know if
> you treat people like this in your country, but here we respect women….Making
> reference to my culture with statements such as, I don't know how you guys
> handle this where you came from. I['ve] been in this country for a long time and
> my colleagues and the people I work with never make reference to that….So this
> kind of statement nonstop over and over and over.

ECF No. 66-3 at 64.  Draoua testified that Newfield "made reference that perhaps in [the]

Muslim world things are different between men and women," and said "I don't know how, you

know, where you came from and the Muslims have their way of treating women." *Id.* at 72, 73. According to Draoua, "on one occasion," Newfield made a comment that "you do not talk to women like this in this country." ECF No. 66-5 at ¶ 24. Draoua maintains that he had never had any problems with female colleagues. *Id.*

Draoua attempted to address with Newfield the growing discomfort Draoua felt with him. *Id.* ¶ 26. On November 26 and December 18, 2018, Draoua asked Newfield to have an agenda for the meetings. *Id.* ¶ 27; ECF No. 66-3 at 64. In response, Newfield stopped the meetings altogether. ECF No. 66-5 ¶ 27. Although regular meetings with Newfield did not continue after December 2018, Draoua and Newfield encountered each other frequently. ECF No. 66-3 at 74.

**Lieberman**

According to Draoua, Lieberman "frequently made comments like 'your background or your origin.'" ECF No. 66-5 ¶ 46. He referred to Draoua's "culture" when discussing how he "related" to people, "often" making statements such as "you do not talk to people like this in this country" and "I don't know how you handle this from where you come from." *Id.* ¶¶ 43-44. On one occasion, when Lieberman was speaking with Draoua about his salary, he asked him "how much money would that be in Algerian money?" *Id.* ¶ 41. Lieberman was "unfriendly" and "would often engage in passive aggressive acts such as asking on the phone 'I do not understand your accent, is it an Algerian accent?'" *Id.* ¶ 47.

**Reprimand**

On November 16, 2018, Draoua met with Newfield and Laura Nesta, Director of Behavioral Health who supervised the treatment coordinators,[1] about an email Draoua had sent

---

[1] A treatment coordinator is a social worker and helps "the physician with the therapy" and organizes "the aftercare when the patient leaves" the facility. ECF No. 66-3 at 97, 154.

to a treatment coordinator.  ECF No. 66-3 at 70.  Newfield counseled and issued Draoua a written warning that stated in pertinent part:

> This letter is intended to address a very serious matter.  I was forwarded your email addressed to [redacted employee name] in which you reprimanded her interruption of rounds to pull a nurse out. Angrily, intimidatingly, and disproportionately responding to her in this manner is a textbook definition of bullying. On an individual basis, this would have been concerning enough, but the shaming you offered in a public forum was a higher level of egregiousness.  To be as clear as possible, there is no justification for addressing a colleague in this manner privately or publicly; both are unacceptable and cannot be tolerated.
>
> In our individual sessions, we discussed the concerns of addressing people while angry and angrily, and these issues seem very related to this episode.  If you are unclear on what constitutes bullying, I would refer you to The Source or our Human Resources partner.  And if you are unclear about how these behaviors can be addressed and changed, beyond just continuing in our individual sessions, I can suggest alternate options.
>
> This letter is not a rebuke of you or your good work that is otherwise noted.  I take no pleasure in addressing issues such as this, but continued episodes of intimidating behavior, including retaliation for this or any other report, will not be tolerated.… Please consider this letter as a formal written warning that any such bullying behaviors will result in escalating disciplinary actions.

ECF No. 66-2 ¶ 28; ECF No. 63-2 at 77.

According to Lieberman, "there was a steady stream of people with complaints about interactions with Dr. Draoua."  ECF No. 66-6 at 16.

**Grand Rounds[2]**

As Director of Training and Education, Draoua was responsible for organizing grand rounds.  ECF No. 66-3 at 81.  He claims that in 2018 or early 2019, with Newfield's knowledge, Draoua was informed that the administrative assistant who had helped him schedule and coordinate grand rounds could no longer assist him.  ECF No. 66-5 ¶ 34; ECF No. 66-3 at 82. Such assistance was "vital" and as a result of the loss of this assistance, Draoua was unable to schedule grand rounds even though he had several speakers ready to present.  ECF No. 66-3 at

---

[2] Draoua testified that "grand rounds is when we bring [in] an expert who gives a talk about major topics" and that the lecture is a "major event."  ECF No. 66-3 at 81.

84; ECF No. 66-5 ¶ 34.   Draoua testified that Newfield knew that Draoua no longer had assistance but that it "didn't matter to [Newfield] and it was not important to him whether the institution have grand rounds or not.  I left, they don't have grand rounds. They didn't have it before me. The whole educational activity I brought. He had had no particular interest in that. What was his interest was just making sure he undermine[d] me, making sure I understand that I am having more than what I deserve because in his view I was a substandard human being." ECF No. 66-3 at 86.

**2019 Performance Evaluation**

On September 3, 2019, Newfield issued Draoua a performance evaluation for the period of July 1, 2018 - June 30, 2019.  ECF No. 66-2 ¶ 29; ECF No. 66-4 at 2.  The comments section stated:

> Dr. Draoua is a valued psychiatrist in our department.  He manages his patients with their best interest in mind and does well to keep the department's administration informed of sensitive concerns as they arise for his patients.
> There have been a couple of interactions during the year in which his interactions with other staff members have been reported as concerning.  One such event resulted in a written warning with which Dr. Draoua fully complied, though there could have been more demonstrated self-reflection.
>
> * * *
>
> Dr. Draoua performs well as a psychiatrist in our department.  His attendance, promptness, and participation [i]n our department's meetings is appreciated as a sign of support for the promotion of positive change in our systems.
> Dr. Draoua seems to run the medical student clerkship efficiently and effectively.
> Dr. Draoua is the department's director of training and education.  In this role, one of the main goals is to arrange grand rounds on an approximately one month basis.  This past year there have been four of these gatherings which is below the desired number.  And as an ominous sign of the year to come, none are scheduled as of yet.
>
> * * *

6

> Dr. Draoua is a successful psychiatrist in our department. His patient care exceeds the department's standards and he meets the annual requirements. He also performs seemingly well (seemingly because the medical school ultimately sets the terms for Dr. Draoua's performance and evaluates him) as the clerkship director. However, as the department's training and education director, some of the goals have not been met, and there needs to be some reevaluation of performance in this role.

*Id.* at 3, 4, 6.  Draoua received a performance rating of three out of four.  ECF No. 66-2 ¶ 30.

**Requests for Time Off**

On June 17, 2019, Draoua requested to use paid time off ("PTO") for July 5, July 22-26, and August 8-9.  ECF No. 66-2 ¶ 31; ECF No. 63-2 at 80.  Newfield approved the requests with the exception of July 5 and told Draoua that it was "not possible" for him to be out that date "given the number of people out noted on the calendar."  ECF No. 63-2 at 79.

On April 2, 2020, Draoua requested to use PTO for April 13 - April 17.  ECF No. 66-2 ¶ 32, ECF No. 63-2 at 82.  Newfield responded:

> Given that this requested PTO week does not adhere to the policy on giving at least 30 days notice, especially given that it coincides with Dr. Lieberman's PTO, I am rather uncomfortable given that approval would mean making an exception which we want to avoid. However, we find ourselves in exceptional times with this [COVID-19] outbreak, and I do appreciate your particular vulnerability in combination with your justified fears. The deciding factor is ultimately that we have ample staff for a low census. Therefore it seems right to exercise compassion and make an exception to accommodate your request at this time. But please be mindful that continued non-adherence to this policy may result in unfavorable outcomes in regards to future requests.

ECF No. 63-2 at 81.

**Draoua protests denial of PTO**

On July 1, 2020, Draoua requested a PTO day but Lieberman denied the request.  ECF No. 66-2 ¶ 33.  Lieberman testified that he denied the request because "we had other staff members out and we would not have been able to run our clinical operations."  ECF No. 63-2 at 146.  Draoua stated that "I asked for a day off three weeks in advance and that was refused,

which is, to say the least, extremely unusual in the workplace." ECF No. 66-3 at 91.  According to Draoua, "[c]ontrary to my colleagues, I faced constant intimidation and discouragement when I attempted to use vacation time. I was unfairly accused of violating the vacation policy which I did not."  ECF No. 66-5 ¶ 49.

Draoua sent Newfield an email stating "I would like to have a meeting with you to discuss some challenges I have been facing when interacting with Dr. Lieberman." ECF No. 66-8 at 2.  Newfield did not respond.  ECF No. 66-3 at 92.  Draoua testified that the challenges to which he was referring were "the undermining, the racial comments, comments about my origin, about my culture, about the way I speak, making – pretending he can't understand me on the phone when I'm talking and he makes references to laughing that it must be my Algerian accent." ECF No. 66-3 at 153.

Later on July 1, Draoua met with Lieberman about his vacation day request.  ECF No. 66-3 at 92.  Lieberman testified that Draoua was "very upset" that his PTO request had been denied.  ECF No. 66-6 at 19.  According to Draoua, he asked Lieberman "What is it?  Is there something about me? About my origin? About my religion? What is it?  Why am I facing this discrimination?"  ECF No. 66-3 at 92.  Lieberman testified that Draoua "made a comment, do you have a problem with my origins?"  ECF No. 66-6 at 19.  Lieberman ended the meeting and contacted Human Resources.  ECF No. 66-3 at 92; ECF No. 66-2 ¶ 35.  Lieberman relayed to Human Resources that "there has been a past history of behavioral issues with this employee" and that Draoua had spoken to him "in a manner that made him feel uncomfortable." ECF No. 66-10 at 4.  Lieberman requested Maurice Lee, who worked in Human Resources, to contact him at his "earliest convenience" because "I am quite anxious about this doctor making false accusations about me."  *Id.* at 3.

**August 6, 2020 Meeting**

On July 30, 2020, Lee told Lieberman that he had had a conversation with Draoua and asked Lieberman to schedule a meeting for the three of them.  ECF No. 66-11 at 2.  On August 6, 2020, Draoua, Lieberman, and Lee had a conference call.  ECF No. 66-3 at 95.  Draoua testified that the focus of the meeting was his PTO request and that Lee "did not want to hear about discrimination, all he wanted to hear is you get – you refused a day off and you are talking about discrimination.  I attempted to say well, that's not exactly what happened. The discrimination was taking place and the day off was not -- just an example. He goes, we're not going to talk about that, we're going to talk about [the] day off. An administrator has the right, your director has the right to refuse. And he lectured me on the fact that a day off or vacation time, whatever it is, a director can refuse it, which I know. But that was not the issue here."  *Id.* at 93.  According to Lieberman and Lee, Draoua denied that he made a statement about discrimination.  ECF No. 66-6 at 23, 24 (Lieberman testified that "the issue was put to bed by Dr. Draoua saying he never said that" and that Draoua "in fact, denied having said what he said"); ECF No. 66-7 at 24 (Lee testified that Dr. Draoua said that he did not believe that the PTO request was denied because of his ethnicity).  Lee also testified that he "ask[ed] Dr. Draoua if he had examples  … of any ethnicity issues, and he stated he did not."  *Id.*

**August 28, 2020 Meeting**

On August 24, 2020, Lieberman sent Draoua an email asking Draoua to meet with him and Nesta to discuss "recent critical concerns."  ECF No. 66-5 at ¶ 69; ECF No. 66-13 at 6. The meeting was scheduled for August 28, 2020.  ECF No. 66-6 at 27.  According to Lieberman, the meeting was the beginning of a "performance improvement process."  ECF No. 66-6 at 28.

Lieberman drafted an outline of issues to "frame [the] discussion with Dr. Draoua."  ECF No. 66-12 at 3.  He sent the outline to Lee in HR and asked him to review it and speak with him before the meeting.  *Id.*  The outline stated that the "purpose" of the meeting was "to discuss several critical concerns we have with your job performance." *Id.* at 4.  The concerns included Draoua's "inconsistent presence on campus," "[i]nterpersonal issues" including Draoua's "intimidating demeanor," and his "prescribing practices."  *Id.* at 5.  The outline stated that a followup meeting would be scheduled the week of September 21.  *Id.*

Draoua states that he was "directly attacked" in the August 28, 2020 meeting.  ECF No. 66-3 at 97.  He testified that Nesta stated that "we are having problems" and told Draoua that the treatment coordinators did not want to work with him.  *Id.*  Draoua testified that he was shocked by this because "to [his] knowledge [he] had excellent relationships with treatment coordinators" and had an "excellent relationship" with "the main one who worked with [him]."  *Id.*  When Draoua asked if there were any formal complaints or documents, Nesta refused to answer.  ECF No. 66-5 at ¶ 70.  Lieberman told Draoua that the treatment coordinators did not want to write anything down because they were afraid of retaliation, which Draoua did not believe.  *Id.* at ¶ 71.

**Security Badge**

During the meeting, Lieberman noticed that the security badge Draoua was wearing was not his badge and did not bear his identity.  ECF No. 66-2 ¶ 44.  The Joint Commission and the Connecticut Department of Public Health have strict regulations about how health care workers, including physicians, identify themselves.  *Id.* ¶ 18.  The badge Draoua was wearing said "Ascension," which owned St. Vincent's before it was acquired by Hartford Healthcare in 2019.  ECF No. 63-2 at 73; ECF No. 66-2 ¶ 10.  There was white tape over the employee's name; the

tape also partially obscured the photograph of a man who did not look like Draoua.  ECF No. 63-2 at 73 (photo of badge).  *See also* ECF No. 63-2 at 67 (photo of Draoua's badge).

Lieberman asked Draoua why he was wearing that badge.  ECF No. 66-3 at 98.  Draoua responded that security had given it to him to use.  *Id.*; ECF No. 66-6 at 32.  Lieberman testified that he did not believe that security had given Draoua that badge to use as a temporary badge because a temporary badge was just a "piece[] of plastic" with "no labeling."  *Id.* at 31.  According to Lieberman, Draoua was wearing another physician's badge, not a temporary badge, *id.* at 36, and "we do not share the badges of one staff member with another staff member." *Id.* at 31.  Nesta testified that Draoua's wearing of another person's badge was "in violation of Hartford Healthcare policy and in violation of Joint Commission standards."  ECF No. 63-2 at 208.  Lieberman asked Draoua for the badge and immediately sent him to security to obtain a temporary badge.  ECF No. 66-2 ¶ 45.  Security issued Draoua a "proper, temporary security badge."  *Id.* ¶ 47.  The card had no picture and no name.  ECF No. 66-3 at 98.

**After the August 28th Meeting**

Lieberman testified that he informed "Hartford Healthcare's administration" including Dr. Jim O'Dea, chief operating officer of the Behavioral Health Network of Hartford Healthcare, of "the badge issue" and that the "directive at that time was that an investigation would need to be conducted and that Dr. Draoua would need to be given a temporary paid leave during that time."  ECF Nos. 66-13 at 7, 66-6 at 38; 39 ("I was instructed, through a collaboration of HHC Leadership and HR, to use specific language to … have a meeting with Dr. Draoua and Laura [Nesta] present to say that we were putting Dr. Draoua on paid temporary administrative leave and my understanding was beginning a formal process of investigation."); ECF No. 67-1 at 80 (Nesta testified that Draoua was placed "on paid suspension pending an investigation so that we

11

could take a further look at the badge and how he represented himself as an employee to our patients.")  Lieberman informed Laurie Clinton, who took over from Lee in Human Resources on September 1, 2020, about Draoua's use of another physician's badge and gave her a copy of the script he had prepared for the August 28, 2020 meeting with Draoua.  ECF No. 66-2 ¶ 51; ECF No. 66-7 at 31.

**September 1 Meeting**

On September 1, 2020, Lieberman and Nesta met with Draoua.  ECF No. 66-2 ¶ 54. Draoua was told he was suspended with pay.  ECF No. 66-3 at 106-07.  When Draoua asked why he was being suspended, Nesta said that they were not "here to discuss."  *Id*. at 108; ECF No. 66-5 ¶ 79.  Draoua was told someone would be in touch with him within 72 hours.  ECF No. 66-3 at 108.  He was not provided anything in writing.  *Id*. at 110.

According to Draoua, Lieberman asked him to return his keys and badge to security, and to "empty [his] office and take all [his] personal belongings with [him.]."  ECF No. 66-5 ¶ 78; ECF No. 66-3 at 111 ("they told me to empty my office and take everything, all my belongings. And I recall saying what about my couch? I have a leather couch there and whatever they said, we would put it in a safe place for you to pick up it later.")

Later that day, Nesta sent an email to Newfield, Lieberman, and O'Dea about the meeting with Draoua that stated:

> Dr. Lieberman, myself and Dr. Draoua met together on the Westport Campus in the Board room at 3:30 pm.
>
> Dr. Lieberman informed him of the following:
>
> • Purpose of our meeting was to follow up with concerns discussed during meeting on Friday August 28
> • Stated that there was further consultation with HHC leadership and human resources
> • Informed him that he was suspended, effective immediately

• Informed him that this was a paid administrative leave
• Informed him that someone would be in contact with him within 72 hours - he asked who - Dr. Lieberman said he wasn't sure but someone would be back in touch with him in 72 hours
• He was told that he needed to leave the building as of 4pm today, that he needed to leave the temporary badge, hospital keys and any and all hospital property including computer and phone on his desk.
     o He asked about his couch - he was advised that if he was not returning arrangements would be made with security to pick up any additional belongings, but that he could take any personal positions [sic] that he was able to remove before 4pm today.
• Dr. Lieberman asked him if there were any clinical issues he needed to be aware of- Dr. Draoua responded - "you can look at that yourself"
• He then attempted to engage in a discussion directed toward Dr. Lieberman
     o "Why are you doing this to me, do you just want me to leave, I will leave"
     o Laura Nesta responded that this meeting was over, that there is no further discussion, that he is - effective immediately - on paid administrative leave.
As he was getting up to leave he made a comment "you're really hurting me" (or something to that effect - Dr. Lieberman - please comment further).
Nothing else remarkable, he did ask for a piece of paper as the conversation started and took notes.
The meeting started at 3:30 pm and ended at 3:40 pm

ECF No. 66-14 at 2.

### Subsequent Events

The next day, September 2, 2020, Draoua's attorney wrote to Nesta and Lieberman and asked that they provide Draoua with the specific allegations that formed the basis of the decision to suspend him. ECF No. 66-15 at 2-3. Hartford Healthcare did not respond. ECF No. 66-3 at 110.

Lieberman testified that he confirmed with security that "we don't share badges and give out badges of other doctors" and that if "someone loses a badge, they have to use a temporary, blank badge, not someone else's." ECF No. 66-6 at 31-32. According to Clinton, the Director of Human Resources, "it is not our standard procedure in the security office to hand out an old badge with a piece of tape across the middle hiding the face and the name and giving it to a

physician to use." ECF No. 63-2 at  255.  Lieberman and Clinton stated that as part of the

investigation, a report was run on the badge's swipes.  ECF No. 63-2 at 160 (Lieberman testified

that "I sent the badge information to the head of security and asked them to run the swipes"); *id.*

at 256 (Clinton testified that "We pulled the swipe records.")

No one from Hartford Healthcare contacted Draoua. ECF No. 66-3 at 108.  Draoua did

not receive a termination letter and no one ever said he was terminated.  ECF No. 66-3 at 111,

112, 127.

On September 17, 2020, Draoua, using his Hartford Healthcare email address, sent

Newfield an email, the subject line of which was "Formal Notice of Resignation," that stated:

> Dear Dr. Newfield,
>
> I would like to inform you that after careful consideration I am writing to give
> you my formal notice of my resignation with immediate effect from Hartford
> Healthcare & St. Vincent's Multi speciality Group.
>
> I have had the chance during these years to work closely with amazing staff
> members and I am proud of the very successful team we built together.
>
> Best regards,
> Jay Draoua

ECF No. 63-2 at 75-76.  A few minutes later, Draoua sent Newfield another email that stated in

pertinent part:

> My decision to resign is based on the fact that I have been suspended as you know
> during the brief meeting on 09/01/20 with Dr. Lieberman and Laura Nesta. No
> explanations for this decision were provided[.]  I was not provided with any letter
> or even a discussion about my rights and obligations during the suspension. Dr.
> Lieberman stated that "someone" will be in touch with me within[] the next 72
> hours, did not want to indicate who or from which department. This turned out not
> to be true as this suspension evolved to an indefinite duration without any
> communication. He asked me to return my hospital badge and keys and told me
> that I have twenty minutes to take all my personal belongings from my office
> which I had to carry outside publicly. The two emails and letters from my lawyer
> … that he sent on my behalf to the three of you on 09/02 and 09/08/20 requesting
> the reasons for this suspension have been ignored.

> I want to be very clear that my decision to resign is by no mean an admission on my part of any wrong doing whatsoever.
>
> It is my belief and position that this suspension is violating the terms and spirit of my employment agreement. I believe this decision which is taken place in a context of discrimination is unreasonable, baseless, retaliatory, defamatory and has already affected me at several levels.

ECF No. 66-16 at 2.

That afternoon, Newfield notified Draoua that he accepted Draoua's resignation. ECF No. 63-2 at 75. Newfield stated that as "far as your personal belongings remaining in your office, please be in touch with me in order to arrange a convenient and discre[et] time during which you can collect your belongings." *Id.*

In subsequent communications with a recruiter, Draoua stated that his "resignation was voluntary and no one asked me to resign. I resigned because I did not want to have anything to do with this hospital or this chairman." ECF No. 63-2 at 75.

## II.     LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc*., 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as

to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

### III.   Discussion

#### A.   *CFEPA Discrimination Claims*

##### i.   *Applicable Law*

Draoua's CFEPA discrimination claims are subject to the same *McDonnell Douglas* burden-shifting framework applicable to Title VII discrimination claims. *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination "by showing that: (1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). The plaintiff's burden of establishing a *prima facie* case in a discrimination suit is "*de minimis*." *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

If the plaintiff satisfies his *prima facie* case, the burden then "shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). If the employer is able to provide such a reason, then the employee must demonstrate "the legitimate reason[] offered by the [employer] w[as] not its true

reason[], but w[as] a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 143 (2000).

### ii.    Prima Facie *Case*

Draoua alleges that he was discharged on the basis of his national origin and/or religion. Hartford Healthcare argues that Draoua fails to state a *prima facie* case of discriminatory discharge because he did not suffer an adverse employment action.  Specifically, Hartford Healthcare asserts that Draoua was placed on paid administrative leave, which does not constitute an adverse action, citing *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).  Draoua argues that *Joseph* is inapposite because under the circumstances of this case, there is a question of fact as to whether he was either terminated or constructively discharged, relying on *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81 (2d Cir. 1996).

### a.    *Actual Discharge*

Discriminatory discharge may be shown through "a showing of an actual or constructive discharge." *Chertkova*, 92 F.3d at 87.  "An actual discharge, in the context of Title VII as in other contexts, occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated." *Id.* at 88 (internal quotation marks omitted). "Inquiry focuses on the reasonable perceptions of the employee, not on whether formal words of firing were in fact spoken." *Id.*

In *Chertkova*, on which Draoua relies, the Second Circuit determined that a factual question existed regarding whether Chertkova was actually discharged. *Id.* at 89.  Chertkova's supervisor had "called her into an office with closed doors and berated and yelled at [her] for

17

hours" and during these meetings, had threatened her, saying: "What do you hope for? Do you think you are going to outlive us? There is no chance! You are not going to be here!" *Id.* at 85. He also told her that she was "too expensive," and mocked her when she attempted to explain she was at the bottom of the pay range for her position. *Id.* at 89. He later placed Chertkova on formal probation, and told her even after she successfully completed probation, that she could be fired immediately if, over the course of two years, she did not "maintain satisfactory performance" in a number of areas. *Id.* On March 5, 1991, Chertkova learned that her supervisor was soliciting employees for negative information about her. She suffered a nervous breakdown, left work, and never returned. *Id.* at 85-86. Her employer had prepared a letter of termination dated March 6, 1991 that referred to her purported failure to live up to the admonitions that followed her probation and her failure to complete in a timely fashion a recent assignment, although Chertkova said she did not receive the letter. *Id.* at 86. She maintained that her efforts to communicate with her employer were turned aside. *Id.* Upon review of this evidence, the Second Circuit found that "a reasonable person in Chertkova's shoes might have thought she was in fact discharged after March 6, 1992, despite the fact that she had not received her official letter of termination." *Id.* at 89.

Draoua argues that here, as in *Chertkova,* a factual issue exists as to whether a reasonable person in his shoes would believe he was discharged. I disagree. The indicia present in *Chertkova* – such as ominous comments ("You are not going to be here!"), the threats that she would be fired immediately if she did not maintain satisfactory performance levels, and her employer's surreptitious solicitation of negative feedback around the same time it drafted a termination letter - are absent. And what remains does not suggest that Draoua was actually terminated. When all inferences are drawn in Draoua's favor and the evidence is viewed in the

light most favorable to him, Lieberman and Newfield made various derogatory comments about Draoua's origin and religion, commented on his salary and insinuated he was overcompensated, denied his requests for certain vacation days, and began to discuss serious performance issues with him only after he raised the issue of discrimination with Lieberman.  He also was told when he was placed on paid administrative leave to "empty [his] office and take everything, all [his] belongings", and not communicated with for more than two weeks after he left, despite his attorney's letter.  ECF No. 66-3 at 111, 112.  He nonetheless acknowledges that he was told he was being placed on a paid suspension and never told that he was terminated; he does not suggest that he was not, in fact, paid during his suspension; and he sent Newfield a letter of resignation, which he later forwarded to a recruiter, to whom he stated, "my resignation was voluntary and no one asked me to resign."  ECF No. 63-12 at 75.  I am not persuaded that the evidence in the record is sufficient to enable a reasonable factfinder to conclude that Draoua was actually discharged.

### b.    Constructive Discharge

Alternatively, Draoua argues that he was constructively discharged.  ECF No. 66-1 at 13. I disagree.

"Constructive discharge of an employee occurs when an employer … intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova*, 92 F.3d at 89.  A work atmosphere is "intolerable" if conditions are "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987)).  The evidence proffered by Draoua is insufficient to establish his working conditions were so intolerable that a reasonable employee in his position would have felt *compelled* to resign.  In

*Chertkova*, the court found that there was a genuine dispute of fact about constructive discharge where "Plaintiff's evidence suggest[ed] her supervisor engaged in a pattern of baseless criticisms, said she would 'not be around' and that she would be fired instantly if she did not meet certain ambiguous behavior objectives," where the plaintiff suffered a nervous breakdown, allegedly due to her working conditions, the day before her termination letter was to be delivered, and where an affidavit from a former employee stated that "creating intolerable conditions to force unwanted employees to quit was a recognized practice of the [employer's] managers."  92 F. 3d at 90.  Here, by contrast, Draoua received largely positive performance reviews and, though there is evidence he was subjected to derogatory comments about religion and ethnicity by two supervisors, he does not present evidence that these comments were so pervasive as to make his working conditions "intolerable."  The record does not suggest he was in their presence most of the time; he is a fully credentialed psychiatrist, and he does not suggest that Dr. Newfield or Dr. Lieberman directly supervised his day to day interactions with patients, nurses, social workers, or other staff, although he was chastised in the August 28, 2020 meeting for his alleged mistreatment of social workers.  Nor does he suggest that the comments by Drs. Newfield and Lieberman were what triggered his leaving the building on September 1 - in sharp contrast to Chertkova, who suffered a nervous breakdown the day she learned that her supervisor was soliciting negative comments about her from other employees.  For his part, Draoua "voluntar[il]y" resigned over two weeks after he had left the office due to being placed on paid administrative suspension and apparently partly because his employer was not responding to him.  He plainly was not being subjected to "intolerable" working conditions at the time of his resignation.  Finally, Draoua presents no evidence from which a reasonable juror could infer that his employer "*intentionally* create[ed] an intolerable work atmosphere."  *Chertkova*, 92 F.3d at

20

89 (emphasis added). *See Owusu v. Hartford Fin. Servs. Grp., Inc*., No. 3:05CV964(JCH), 2006 WL 3500884, at *7 (D. Conn. Nov. 28, 2006) (evidence was insufficient to establish constructive discharge where plaintiff received an unsatisfactory performance appraisal, a written warning, increased supervision, and a serious offer of separation through his employer's performance-based severance option, and claimed that his supervisors believed it was likely that he would be terminated at the end of his probationary period).

I conclude that Draoua has failed to submit enough evidence to raise a genuine factual dispute about whether he suffered an adverse employment action.

### iii.    *Non-Discriminatory Reason*

In the remainder of the analysis of Draoua's discrimination claims, I assume *arguendo* that he has established a *prima facie* case.  At the second step, the burden shifts to Hartford Healthcare to articulate a non-discriminatory basis for its actions.  Hartford Healthcare has presented evidence that it placed Draoua on temporary paid administrative leave to investigate his use of another physician's security badge.  ECF No. 66-6 at 38; ECF No. 67-1 at 80.  A defendant's burden to produce a legitimate, non-discriminatory reason "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks and citation omitted).  Hartford Healthcare has met its burden of production here.

### iv.    *Pretext*

The burden thus shifts back to Draoua to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ*., 224 F.3d 33, 42 (2d Cir. 2000).  To do so, he must produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate,

non-discriminatory reasons proffered by [the defendant] were false, and that more likely than not discrimination was the real reason for the [defendant's] action." *Id.* (alterations and internal quotation marks omitted).

Draoua argues that Hartford Healthcare's proffered reason - to investigate his use of another physician's security badge - was false and points to his testimony that security had given him the badge to use, which he contends "call[s] into question the genuineness" of the defendant's stated reason.  ECF No. 66-1 at 19.  But Draoua's testimony does not suggest that Hartford Healthcare's reason was false; rather, it is merely evidence that he disagreed that any investigation was warranted.  Hartford Healthcare was not obligated to accept Draoua's explanation when there was evidence that it was inconsistent with the protocol security followed when a physician forgot his or her badge.  An employee's quarrel with an employer's decision does not create an issue as to the veracity of its reasons and does not establish pretext.  "[A] plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact."  *Fleming v. MaxMara USA*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009), *aff'd*, 371 Fed. App'x 115 (2d Cir. 2010); *see Saunders v. New Horizons Computer Learning Ctr. of Metro. New York,* 2002 WL 1067823, at *4 (S.D.N.Y. May 29, 2002) ("an employer's belief that an employee violated company policy need not be accurate to serve as a legitimate reason for termination, as long as that belief was honestly held."), *aff'd,* 68 Fed. App'x 224 (2d Cir. 2003).

Draoua points to Newfield's remarks suggesting Draoua had difficulties relating to others, particularly women, because of "where [he] came from" and because he was Muslim.[3] ECF No.

---

[3] Hartford Healthcare argues that the Court should not consider Newfield and Lieberman's alleged discriminatory remarks because the decision to place Draoua on suspension was made by Hartford Healthcare "leadership," and Draoua does not allege that anyone within the "leadership" made any discriminatory remarks.  ECF No. 63-1 at 19.  Draoua responds that the remarks can be imputed to Hartford Healthcare under the "cat's paw" theory of liability.

66-3 at 4.  *See* ECF No. 66-3 at 4 ("I don't know if you treat people like this in your country, but here we respect women", and "I don't know how you guys handle this where you came from"); ECF No. 66-3 at 72, 73 ("perhaps in [the] Muslim world things are different between men and women" and "I don't know how, you know, where you came from and the Muslims have their way of treating women."); ECF No. 66-5 at ¶ 24 ("on one occasion," Newfield made a comment that "you do not talk to women like this in this country.")  Newfield also made references to Draoua's salary and implied that he was overpaid.  ECF No. 66-3 at 62 ("[s]ometimes [Newfield] would look at me and say[] how does it feel to be paid more than your chairman?"); *id.* at 63 (Newfield asked Draoua "do you think in Algeria people are making that kind of money jokingly, half jokingly.").  According to Draoua, Lieberman "frequently made comments like 'your background or your origin'" and referred to Draoua's culture when discussing how he "related" to people, "often" making statements such as "you do not talk to people like this in this country" and "I don't know how you handle this from where you come from."  *Id.* ¶¶ 43-44, 46.  Lieberman also told Draoua that he did not understand him because of his accent.  *Id.* ¶ 47 ("'I do not understand your accent, is it an Algerian accent?'")  He, like Newfield, commented about Draoua's salary and his country of origin.  *Id.* ¶ 41 ("how much money would that be in Algerian money?").

There is little evidence as to when these remarks were made. As for the content and the context of the remarks, although Draoua was offended by the comments about his salary, it's hard to see how comments about how highly compensated Draoua was could be viewed as discriminatory.  Other comments, however, attribute his allegedly poor communication and

---

ECF No. 66-1 at 22.  *See Gentleman v. State Univ. of N.Y. Stony Brook*, No. 21-1102-CV, 2022 WL 1447381, at *4 (2d Cir. May 9, 2022)(The "cat's paw" theory "imputes a discriminatory motive to a decisionmaker of an adverse employment action where such action is proximately caused by the animus of his subordinate—that is, 'the supervisor, acting as agent of the employer, has permitted himself to be used as the conduit of the subordinate's prejudice.'").  I need not resolve this issue because I find the proffered evidence insufficient.

interpersonal skills to his national origin and religion and are more indicative of discriminatory animus.  But these remarks, although offensive and biased, are stray and there is no evidence tethering them to any adverse action.  Further, Draoua does not suggest that any such remarks were made around the time he was suspended with pay and told to clean out his desk – an event that was immediately preceded and, the evidence suggests, triggered by the observation that he was wearing another doctor's badge, which his employer viewed as a potential disciplinary violation that it needed to investigate further.  Even when the record is construed in the light most favorable to Draoua, the evidence does not support the inference that Hartford Healthcare was motivated by a discriminatory animus when it suspended him.  Accordingly, the motion for summary judgment as to his discriminatory discharge claims is granted.

   *B.*  *CFEPA Retaliation*

     *i.*  *Applicable Law*

   Draoua alleges that Hartford Healthcare terminated him in retaliation for engaging in conduct protected by the CFEPA. "To establish a prima facie case of retaliation, a plaintiff must show four elements: (1) that he participated in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action against him; and (4) a causal connection between the protected activity and the adverse employment action." *Ayantola v. Bd. of Trustees of Tech. Colleges*, 116 Conn. App. 531, 536 (2009).  "Like discrimination claims, when considering retaliation claims Connecticut courts look to federal precedent." *Taylor v. State of Connecticut Dep't of Correction*, No. NNHCV095030106S, 2010 WL 3171317, at *9 (Conn. Super. Ct. July 12, 2010).

   As with the CFEPA discrimination claims discussed above, if a plaintiff makes out a prima facie case, the burden then shifts to the defendant to present evidence of a non-retaliatory

reason for the adverse employment action. If the defendant is able to do so, the burden shifts back to the plaintiff to present evidence that the stated reason is pretextual.

ii.     Prima Facie *Case*

Hartford Healthcare argues that Draoua fails to state a *prima facie* case because he cannot establish that he engaged in a protected activity. ECF No. 63-1 at 22.[4]  I disagree.

Protected activity in this case "refers to action taken to protest or oppose statutorily prohibited discrimination." *Benn v. City of New York*, 482 Fed. App'x 637, 638 (2d Cir. 2012) (quotation marks omitted).  Title VII and CFEPA protect "formal charges of discrimination as well as … informal protests of discrimination, including making complaints to management[.]" *Agosto v. Premier Maint., Inc.*, 185 Conn. App. 559, 587 (2018) (internal quotation marks omitted).  "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). "Thus, complaints that are vague and ambiguous and do not sufficiently articulate the nature of the harassment do not constitute a protected activity." *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 643 (D. Conn. 2005). Here, Draoua's statement – though informal – could and was understood to protest discrimination.  This is sufficient.

Hartford Healthcare next argues that Draoua did not suffer an adverse employment action after he complained in the July 1 meeting.

_____

[4] To the extent that Hartford Healthcare relies on Lee and Lieberman's testimony that Draoua denied making any any claim of discrimination in the July 1 meeting, ECF No. 63-1 at 22, Draoua did not so testify.  And in any event, the record clearly indicates that Lieberman understood Draoua to be making a claim of discrimination.  ECF No. 63-2 at 147-48.

In retaliation cases, the standard for an adverse employment action is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Harmon v. Univ. of Connecticut*, No. HHDCV156056506S, 2018 WL 1475874, at *17 (Conn. Super. Ct. Feb. 21, 2018) (discussing retaliation claim under CFEPA); *Muir v. City of Hartford*, No. HHDCV156063640S, 2018 WL 2293072, at *11 (Conn. Super. Ct. Apr. 30, 2018) (same).

In addition to maintaining his claim that he was actually or constructively discharged,[5] Draoua appears to argue that the adverse action was Lieberman's "attack" on his performance and points to Lieberman's communication to Human Resources after Draoua's comment that "there has been a past history of behavior issues with this employee."  ECF No. 66-1 at 18. According to Draoua, the "near-instantaneous temporal proximity between [his] complaint and Dr. Lieberman's beginning to attack Plaintiff's performance" (presumably beginning on July 1 and encompassing the August 28th meeting about his performance) is sufficient to satisfy his *prima facie* burden.  *Id.*  I disagree that under the circumstances here, Lieberman's raising concerns about Draoua's performance constitutes an adverse action.  The record does not suggest that Lieberman's mere reporting to Human Resources on July 1 that he was having "an emergent issue" with Draoua and that Draoua had a "past history of behavior issues" by itself had any discernible impact on Draoua's working conditions.  And insofar as Draoua alleges that Hartford Healthcare began a performance improvement process during the August 28 meeting, that does not rise to an adverse action.  *See Brown v. Am. Golf Corp.*, 99 Fed. App'x 341, 343 (2d Cir.

---

[5] Draoua does not argue that placement on paid suspension constitutes adverse action. *See Booth v. Connecticut*, No. 3:09CV2131(MRK), 2011 WL 3611352, at *8 (D. Conn. Aug. 17, 2011)("it is clear that a reasonable jury would not find that placement on paid administrative leave constitutes an adverse employment action for purposes of a Title VII retaliation claim when an internal investigation is pending.")

2004) ("Brown's claim that being placed on the Performance Improvement Plan constituted retaliation in violation of Title VII fails at the prima facie stage because being placed on the Performance Improvement Plan was not an adverse employment action."). Further, the August 6 three-way call with Human Resources in which Draoua was admonished about his supervisor's authority to disapprove requests for time off - the only other event of significance that followed Draoua's July 1 complaint of discrimination - would hardly be enough, either by itself or together with the August 28 meeting, to dissuade a reasonable employee from making a discrimination claim. As a result, I conclude that Draoua has not stated a *prima facie* case.

### iii.    Non-Discriminatory Reason & Pretext

Even if Draoua had established a *prima facie* case of retaliation, as discussed above in the context of his discrimination claims, Hartford Healthcare has presented evidence of a legitimate, non-retaliatory reason for its alleged adverse action. The burden thus shifts to Draoua "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."[6] *Luth v. OEM Controls, Inc.*, 203 Conn. App. 673, 690 (2021) (adopting trial court's opinion). Draoua fails to present evidence from which a reasonable juror could infer that the reasons Hartford Healthcare provided were pretextual, let alone that Hartford Healthcare acted with retaliatory animus. Draoua's reliance on the "temporal proximity" between his protected conduct and the actions he alleges are adverse, without more, is misplaced once past the prima facie stage. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("[t]emporal proximity alone is insufficient to defeat summary judgment at the

---

[6] For Title VII retaliation claims, retaliation must have been a "'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Gomez v Metro Dist.*, 10 F. Supp. 3d 224, 235 (D. Conn. 2014) (citing *Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S. 338, 348-349 (2013)). Although CFEPA and Title VII are generally interpreted and applied jointly, it appears that there is no Connecticut appellate authority on this point. *See Jones v. Natchaug Hosp., Inc.*, No. 3:17CV1099 (JBA), 2019 WL 4723066, at *8 n.2 (D. Conn. Sept. 25, 2019) (noting a "discrepancy" in the Connecticut superior courts). I need not determine which standard applies because Draoua has not met his burden of proof as to his retaliation claim under either the "but-for" standard or the less demanding substantial or motivating factor test.

pretext stage.").  In any event, to the extent the paid suspension combined with the instruction to clear out Draoua's desk and ensuing lack of communication with him might be regarded as adverse action, the chain of temporal proximity here was broken by Dr. Lieberman's observation of Draoua's wearing another doctor's badge on August 28 and the ensuing investigation, which closely preceded the September 1 paid suspension.  *Gonzalez v. Metro-N. Commuter R.R.*, No. 18-CV-10270(CM), 2020 WL 230115, at *8 (S.D.N.Y. Jan. 15, 2020) ("An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference." (internal quotation marks omitted)).  Accordingly, Draoua has failed to present sufficient evidence in support of this claim to survive summary judgment.

## IV.     Conclusion

For the reasons above, Hartford Healthcare's motion for summary judgment (ECF No. 63) is GRANTED.

IT IS SO ORDERED.

                                                              _____/s/_____
                                                              Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
          February 16, 2024